Filed 3/12/14  In re Orlando L. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re ORLANDO L., a Person Coming Under the Juvenile Court Law. | B249289 |
| | (Los Angeles County Super Ct. No. CK92639) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RITA L.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marilyn K. Martinez, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

John Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel for Plaintiff and Respondent.

_____

Rita L. appeals from the juvenile court's order denying her petition under Welfare and Institutions Code[1] section 388 for reinstatement of reunification services with her son Orlando L. She further claims that the failure to grant her request for a hearing under section 388 necessitates reversal of the court's subsequent termination of her parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 15, 2012, two-month-old Orlando L. was dropped off at a hospital by Marcus P., a nonrelative who reported that Orlando L.'s mother Rita L. was a drug user and a prostitute who had abandoned the child. Orlando L. had multiple bruises that covered large portions of his body and that did not appear accidental. He appeared well-nourished and to have appropriate development and responses to stimuli.

Marcus P. told the Department of Children and Family Services (DCFS) that Rita L. had been his roommate but was not at his home currently. He said that Rita L. would leave for weeks at a time and that he could not take care of Orlando L. When asked about Orlando L.'s injuries, Marcus P. claimed that on March 12, 2012, Rita L. had come to the home and hit Orlando L. with her hand, upsetting Marcus P. and prompting him to order her to leave. DCFS immediately "had concerns with regard to his statements and the freshness of the bruises on the child. It appears that his story and the child's injuries were inconsistent."

DCFS filed a petition alleging that Orlando L. came within the jurisdiction of the juvenile court under section 300, subdivisions (a) and (b). Specifically, under section 300, subdivision (a) and (b), DCFS detailed Orlando L.'s injuries; alleged that Rita L. had caused these injuries by "deliberate unreasonable and neglectful acts"; and alleged that Rita L. had physically abused Orlando L. by hitting him with her hands. Also under section 300, subdivision (b), DCFS alleged that Rita L. had placed Orlando L. in a detrimental and endangering situation by leaving him with Marcus P. for more than one

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

month while she engaged in prostitution; that Rita L.'s drug and alcohol abuse left her incapable of providing care and supervision to Orlando L.; and that Rita L. and Marcus P. engaged in domestic violence, including an incident in which he struck her on the cheek, leaving a bruise. Orlando L. was placed in foster care.

When located, Rita L. denied that she had hit Orlando L. She told DCFS, "I left the baby at home with Marcus. He is my roommate. I was gone a couple of days. I had went with a friend. I don't know how the baby ended up that way. When I left him he was not in that condition." Rita L. said about Marcus P., "I trusted him. Not that it was right but I felt that it was safer for [Orlando L.] to be with [Marcus P.] than go with me into the environment with me." She denied abandoning Orlando L. for a month: "I never left him for more than a month. Yes, I did leave him with [Marcus P.] but not for a month; that is an exaggeration." Moreover, Rita L. noted, "I had left him in his care prior to that and I trusted him with the baby. He assumed the role of the baby's father. It wasn't like I just left him with a stranger. I didn't just take off. I had a phone at the time. He knew how to take him to the doctor; he is a doctor and is a smart person. The baby's medical card and papers were all in a folder and he had access to that."

Rita L. acknowledged that she was engaging in prostitution while she was away from Orlando L. She had been arrested in the past for prostitution, and reported that she turned to prostitution intermittently to survive.

Rita L. denied using alcohol but acknowledged using drugs. She reported that she began using cocaine as a teenager, ten years earlier, although she had stopped using drugs while pregnant and "had [Orlando L.] clean." She had been convicted of a drug possession offense in 2006.

Rita L. described Marcus P. as supportive financially and emotionally and denied any domestic violence. Rita L., however, bore marks on her face that caused DCFS to suspect that she was a victim of domestic violence. Moreover, Rita L.'s former foster mother reported that Marcus P. was aggressive with Rita L. and that he had admitted hitting Rita L. on multiple occasions.

On March 20, 2012, Rita L. was granted monitored visits with Orlando L. She missed a visit scheduled for March 28, 2012, and Marcus P. reported that it was because she was using drugs. She visited Orlando L. for one-half hour on April 2, 2012, and she was observed to be "bonding well" with him: "Mother was affectionate and was talking to Orlando in a loving manner. The child expressed his emotion very expressively by cooing, crying, and looking at the mother in her eyes. Orlando was easily soothed by the mother." Rita L. visited again on April 9 and 16, 2012, for a total of two hours. She failed to appear for visits scheduled for April 23, April 30, and May 7, 2012.

Rita L. failed to appear for drug testing as directed on April 24 and April 25, 2012. On April 27, DCFS instructed Rita L. to submit to an on-demand drug test that day. Rita L. responded that she had not known about the drug test and had used cocaine three days earlier. Although the DCFS investigator urged her to submit to testing nonetheless, she did not appear.

On May 15, 2012, the juvenile court sustained the allegations of the operative petition and found Orlando L. a dependent child of the court under section 300, subdivision (a) and (b). The court ordered that Rita L. receive reunification services and monitored visitation with Orlando L., and she was directed to undergo individual counseling concerning case issues; parenting education; a substance abuse program; domestic abuse counseling; and anger management training. She was also ordered to appear for random weekly drug testing and to participate in a domestic violence support group. Orlando L. was placed in the home of Rita L.'s former foster parents.

For the next six months, Rita L.'s whereabouts were unknown. She neither participated in court-ordered programs nor underwent any drug tests. She did not visit Orlando L. The social worker reported that she had sporadic contact with Rita L., that Rita L. had been arrested twice during those six months, and that Rita L. now reported that she was engaged to Marcus P. In late October Rita L. told the social worker that she would like to enroll in the court-ordered programs.

On November 13, 2012, at the six-month review hearing, the court terminated reunification services and set a hearing under section 366.26 for the following March.

4

Rita L. scheduled a visit with Orlando L. in December 2012, but then did not appear. Later that month, Rita L. made plans to come stay for an overnight visit with Orlando L. to celebrate his first birthday. After she received multiple calls and texts from Marcus P., Rita L. left after only four hours. As of March 7, 2013, Rita L. had not visited Orlando L. again.

Orlando L. was doing well in the home of Rita L.'s former foster parents, who had now agreed to adopt him. Orlando L. had formerly been described by the social worker as unattached to his mother and prior caregivers, making no eye contact with adults, appearing to have no comfort difference when picked up by the social worker, not interacting in social play, and having no interest in toys; but in recent months with his prospective adoptive parents he was making more eye contact, following his caregivers with his eyes, seeking affection, and playing with toys. By March 2013, however, Orlando L. was described as "very happy," and was reported to smile and laugh. He had begun speaking, crawling, and taking steps; and he made eye contact with his caregivers and the social worker. He seemed to love attention, cried when he wanted to be picked up, and immediately stopped crying when successful.

An adoption home study was underway, and was expected to be submitted for approval once a few final documents had been received. Orlando L. had been with the prospective adoptive parents since he was five months old, and they were described as "deeply bonded" to him. They were able and willing to provide for his needs, had a positive and loving relationship with him, and were the only parents he had ever known.

On March 7, 2013, the date of the section 366.26 hearing, Rita L. filed a petition under section 388 in which she requested the reinstatement of reunification services and liberalized visitation. Rita L. asserted that circumstances had changed: she and Marcus P. had completed parenting courses; she was attending further sessions; she was testing negative for drugs; and she was now stable and sober and trying to enroll in school. She told the court that she believed that reinstatement of reunification services and liberalized visitation would be in Orlando L.'s best interest because she had visited Orlando L., they were bonded, and she was addressing the issues that had led to the

5

dependency. She attached certificates of completion for herself and Marcus P. for a course entitled, "Systematic Training for Effective Parenting for Parents with Children Ages 0-5." She also attached negative drug test results dated November 12, 2012, January 10, 2013, and February 1, 2013.

The juvenile court denied the section 388 petition without a hearing on the grounds that it neither demonstrated a change of circumstances nor would the proposed change be in Orlando L.'s best interest. Moreover, the court noted, "Mother [has] not verified compliance/progress re case issues: substance abuse and severe physical abuse of an infant. Visits only sporadic-none for over 2 months." The court then terminated Rita L.'s parental rights. Rita L. appeals the denial of her section 388 petition and contends that the failure to grant a hearing on the petition requires reversal of the termination of parental rights.

## DISCUSSION

Section 388 is a general provision permitting the court, "upon grounds of change of circumstance or new evidence . . . to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a).) The statute, an "escape mechanism" that allows the dependency court to consider new information even after parental reunification efforts have been terminated (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1316), permits the modification of a prior order only when the petitioner establishes by a preponderance of the evidence that (1) changed circumstances or new evidence exists; and (2) the proposed change would promote the best interests of the child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) The petitioner must make a prima facie showing of changed circumstances and best interests in order to obtain a hearing; if the showing is inadequate to make a prima facie case, the trial court may deny the petition without a hearing. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; Cal. Rules of Court, rule 5.570(d).) Further, a parent seeking an order for reunification services after they have been terminated has the burden of proving by a preponderance of the evidence that the benefit to the child of resuming reunification

6

efforts outweighs the benefit the child would derive from the stability of the permanent placement. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464-465.)

The juvenile court stated its reasons for denying the section 388 petition: "There is insufficient new evidence or changed circumstances. Mother has completed a parenting [course]. She had two clean tests this year. There is no evidence that she has attended or completed or made any progress in a drug rehabilitation program. There isn't any evidence that she has made any progress in individual counseling. [¶] The issues that brought this child to the court were not only drug[-]related, but very serious physical abuse issues with a very young child, and, therefore, I cannot find it is in Orlando's best interest to grant the request on the 388 [petition] nor even to find a prima facie basis to set it for hearing."

We review the summary denial of a section 388 petition for an abuse of discretion (*In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 250), and cannot say that the juvenile court abused its discretion here. Rita L. presented no prima facie evidence of changed circumstances—only what at best could be described as "changing" circumstances, which are insufficient to satisfy section 388. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 49.) On appeal Rita L. points to her enrollment in parenting classes, her "drug[-]free lifestyle," and the "resumption of visitation" as changed circumstances, but at best the evidence showed that she was belatedly starting to make changes, not that the circumstances were actually changed. For instance, Rita L. took a parenting class, "Systematic Training for Effective Parenting for Parents with Children Ages 0-5," but she had not enrolled in a drug rehabilitation program, participated in individual counseling, undergone domestic abuse counseling, enrolled in anger management, or participated in a domestic violence support group as she had been ordered to do. Her "drug[-]free lifestyle" was just three clean drug tests over a four-month period. Considering Rita L.'s extensive history of cocaine use, her admission to prior relapses, and her failure to undergo drug rehabilitation, these three clean drug tests, while a positive development, failed to demonstrate a true change of circumstances. Rita L.'s "resumption of visitation" after the termination of reunification services was just one visit

over a span of four months. Even under the most generous light, a single visit over a four-month period can hardly be considered a changing circumstance, let alone a changed circumstance.

Even if Rita L.'s evidence could be considered to present a prima facie case of changed circumstances, she did not make a prima facie showing that the resumption of reunification services would be in Orlando L.'s best interest. As an infant, Orlando L. had not only suffered serious physical injury but he also exhibited behaviors of great concern: he was reported to be unattached to his mother and to his first set of prior caregivers; he made no eye contact with adults; he was indifferent to being picked up by the social worker; he did not interact in social play, and he had no interest in toys. All this had changed by the time of the section 388 petition: Orlando L. was speaking; he made eye contact with the people around him; he mimicked facial expressions; he smiled and laughed; he loved attention and signaled when he wanted attention. Orlando L. was now described as "a very affectionate and happy child" who was thriving in the care of his prospective adoptive parents. He called his prospective adoptive parents "Mommy" and "Daddy," and they were the only parents he had ever known.

Rita L. calls attention to the social worker's report from May 2012 in which she was noted to have acted in a loving manner with Orlando L. and soothed him easily; as of April 2012 he was observed to have been bonded with her. But that observation was made in April 2012—eleven months before the section 388 petition—and there was nothing in the record demonstrating or even suggesting that they remained bonded by the time she filed her reunification petition. After the April 2012 visits that the social worker described positively, Rita L. stopped visiting Orlando L. She did not visit him again until December 2012, and after one visit that month, she did not visit him again. Rita L. had visited Orlando L. only four times in one year, for a total of six and one-half hours. The social worker reported that no mother-child relationship existed. Under these circumstances, evidence that Rita L. and Orlando L. had three positive, loving, and appropriate visits in April 2012 and that they appeared at that time to be attached did not tend to demonstrate that as of March 2013 it would be in Orlando L.'s best interest for

8

reunification services to resume with a mother he had only seen once, for four hours, since then.

Because Rita L. did not establish a prima facie case of changed circumstances or that the requested change would be in Orlando L.'s best interest, the juvenile court did not abuse its discretion in summarily denying the section 388 petition. Our conclusion that the section 388 petition was properly denied without a hearing makes it unnecessary to address Rita L.'s argument that the erroneous failure to conduct a hearing on the section 388 petition requires that the findings and orders from the section 366.26 hearing be vacated.

## DISPOSITION

The order is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

9